Jack Schneiderman, Appellee, v. Interstate Transit Lines, Inc., Appellant.

Gen. No. 43,216.

2

 Heard in the first division of
this court for the first district at the October term, 1944. 
Opinion filed March 26, 1945. Rehearing denied May 21, 1945. Re-
leased for publication May 21, 1945.

DRENNAN J. SLATER, of Chicago, and THOMAS J.
HAMER, for appellant.

JOSEPH D. RYAN and LOUIS P. MILLER, both of
Chicago, for appellee.

MR. PRESIDING JUSTICE NIEMEYER delivered the opin-
ion of the court. .

Defendant appeals from a judgment for $100,000
entered in an action for personal injuries sustained
by plaintiff as the result of a collision between the
automobile driven by plaintiff and defendant's inter-
state passenger bus traveling from Omaha to Chicago.

The collision occurred at the intersection of Madi-
son street and Oak Park avenue in the village of Oak
Park at approximately 5:20 a. m., November 26, 1941.
Oak Park avenue runs north and south and Madison
street extends east and west; Oak Park avenue north
of the intersection and Madison street west of the in-
tersection are each 46 feet in width from curb to curb;
south of the intersection the width of Oak Park is
reduced to 38 feet and east of the intersection Madison

is widened to 75 feet from curb to curb; Madison street and the intersection were paved with brick, which had become worn; Oak Park avenue to the north was paved with asphalt; there were two street car tracks in the center of Madison street; the southwest corner of the intersection was improved by a two-story brick building, extending to the building line on each street; on the northwest corner was a vacant lot 41 feet in width in which used cars were stored by the automobile agency occupying the one-story brick building immediately to the west; this building abutted the building line, which was 16½ feet north of the curb; at the time of the accident no automobiles were in the storage lot. Traffic at the intersection was regulated by stop and go lights placed on each corner, in approximately the following positions: on the northwest corner, 33 feet north of the north curb of Madison street; on the southwest corner, 20 feet west of the west curb of Oak Park; on the northeast corner, 15 feet east of the east curb of Oak Park; on the southeast corner, 33 feet south of the south curb of Madison. The light on the northwest corner is blind or blank on the west side, and its lights are projected only north and south on Oak Park, but, according to the uncontradicted testimony of Lang, a passenger on the bus involved in the accident, are visible at a point 75 feet west of the Oak Park curb. These lights are operated on a 60 second cycle, showing green 33 seconds and red 27 seconds for traffic on Madison, and 27 seconds green and 33 seconds red for traffic on Oak Park; a yellow or amber light, indicating a change in traffic, appears with the green light for three seconds and with the red light for one second just before the change of lights on each street. The Oak Park lights and the Ridgeland lights, a half mile to the east, were synchronized for 30 miles an hour, but the speed limit is 25 miles an hour. At the time of the accident there was no other traffic, vehicular or pedestrian, on either

Oak Park or Madison street; and, except for a sweating or dampness, usually found on brick pavement, the pavement in Madison street was dry.

Plaintiff, a police officer of the city of Chicago, but not then on duty, was alone in his Ford automobile, driving south on Oak Park avenue; the bus, carrying 16 or 17 passengers, was traveling east and was on time, being due at the Chicago terminal at 12th street and Wabash avenue around 6 o'clock; the headlights and other lights on the front of the bus, and the headlights of the Ford, were lighted; the collision occurred in the southwest quarter of the intersection and near the center lines of each street, from which point the automobile, impacted against the front of the bus, was pushed or carried in a southeasterly direction about 70 feet, to a point 4 or 5 feet north of the south curb of Madison and near a trolley post approximately 38 feet east of the east curb of Oak Park; the bus was equipped with dual tires in the rear and there were skid marks beginning just east of the center line of Oak Park and extending to the rear of the stopped bus.

The complaint consisted of two counts, the first charging negligence and the second charging wilful and wanton conduct. In addition to the charges of negligent operation of the bus, excessive speed and failure to keep a careful lookout or to sound a horn, the complaint charged that defendant negligently failed to yield the right of way to the plaintiff, who had started to cross the intersection on the green light and "was lawfully within the intersection when the color green alone was thereafter exhibited on the signals regulating eastbound traffic," and, by amendment made at the conclusion of all the testimony, that defendant negligently failed to yield the right of way to the plaintiff, "who was unable to stop in safety and was proceeding cautiously through the intersection while the color yellow following green was shown on

the traffic control signals regulating southbound traffic, and who was lawfully within the intersection when the color green alone was thereafter exhibited on the signals regulating eastbound traffic.'' Defendant answered, denying the charges of negligence and wilful and·wanton conduct, and alleging that plaintiff was not in the exercise of due care for his own safety, and that plaintiff ''wantonly and wilfully drove the same (his automobile) against the red light onto said intersection and into collision with said bus.'' On appeal defendant's principal contention is that the trial court erred in refusing to direct a verdict in its favor or to enter judgment for it notwithstanding the verdict.

We find no material error in the rulings on evidence or instructions. The damages awarded are unusually large, but the injuries sustained are exceptionally severe. Plaintiff, a strong and healthy man, around 35 years of age at the time of the accident, is now a hopeless and helpless invalid; he is suffering from aphasia, which is permanent and very likely to grow worse; he requires assistance in dressing, eating, and the ordinary activities of daily life. Defendant figures that based upon his expectancy of life, and investment at three per cent, the present value of his loss of wages is $59,000. This leaves nothing for pain and suffering, the cost of an attendant, or other necessary expenses of his invalidism. We will not disturb the judgment because of the size of the verdict.

As to the occurrence, plaintiff introduced the testimony of himself and a passenger on the bus. He called two physicians, who testified as to his physical and mental condition. The physician who treated him shortly after the accident and examined him several times thereafter, testified that at the time of the trial plaintiff's ''answers to questions are not dependable at all.'' The other physician who examined plaintiff, for the purpose of testifying on the trial, said that plaintiff was suffering from a ''marked aphasia of a

motor type, which means that he is unable to formulate words and express them, either by speech or by writing. I found that . . . once his mind got in the groove, he stayed on one particular word, he kept repeating the same word, no matter what question was directed toward him''; that plaintiff ''is not able to formulate sentences to speak of at all''; that most of plaintiff's history was obtained from his brother and from material furnished to the witness; that ''his answers to questions on account of the injury he received did not permit him to say what he meant''; that ''you cannot converse with the man (plaintiff) at all.'' The nature of plaintiff's testimony and the degree of his incompetency may be judged from the following excerpts from his cross-examination: ''Q. When did you go to the Cook County Hospital? Ans. Right arm and brain. Q. Do you remember when you went to the County Hospital? Ans. One day.'' And later: ''Q. Then after you were in the Cook County Hospital, where did you go? Ans. Five weeks, Cook County, five weeks. Q. Well, from Cook County Hospital, where did you go? Ans. Oak Park Hospital, thirteen days, and County Hospital five weeks. Q. Where did you go from County Hospital? Ans. I was going to take light, doctor, Light. Q. You went to Dr. Light? Ans. Yes. green. Q. Green light? Ans. Light. Q. Was that the name of your doctor at Cook County Hospital? Ans. No, no. Six days, Light. Q. Light for six days? Ans. Kalamazoo.''

■■ No objection to the competency of the witness has been made, but it is insisted that plaintiff's testimony supports the conclusion of his doctors. Plaintiff's counsel do not seriously dispute this contention. They say, ''We do not claim that plaintiff's testimony is entirely coherent or reliable. We called him to the stand chiefly for the purpose of demonstrating his condition, both mental and physical.'' Our examination of the transcript of plaintiff's testimony leads us

to the conclusion that he was an incompetent witness, and by this incompetency his testimony is entirely destroyed as evidence. *Conley v. People,* 170 Ill. 587, 593–594; *People v. Brothers,* 347 Ill. 530, 543–544. We have disregarded it in our consideration of the case. *Knudson v. Knudson,* 382 Ill. 492, 499. Evidence supporting plaintiff's claim, to bar the granting of defendant's motion to direct a verdict, must be "competent, pertinent and coming from a legal source." *Hodges v. Baltimore Engine Co.,* 126 Md. 307; 26 R. C. L., Trial, § 75, p. 1067.

Broughton, the passenger called by plaintiff, lived in DeKalb, Illinois at the time of the accident; he was then employed as a night watchman in a manufacturing plant, but his life work had been that of a farmer; he became a passenger on the bus at DeKalb and was seated on the north or left side, directly back of the driver; as soon as the automobile came within range he saw it; the bus was then 150 feet west of Oak Park avenue—the distance being just a guess, and the automobile was probably 100 feet north of the center of Madison street; he watched the automobile, and it looked to him like they were going to have a collision; at no time did he see the color of the signal for Madison street; when the automobile came to the north side of Madison the bus was probably just starting to cross Oak Park avenue; the bus was going the regular speed —probably 30 miles per hour; he did not form any judgment as to the speed of the automobile—it was going maybe 20, maybe more; neither the automobile nor the bus changed speed up to the time of the accident; he did not hear any horn or warning sound on the bus; about the center of the street the automobile swerved a little to the left, and immediately after the impact the bus swerved slightly to the right; at the time of the impact the automobile was probably very near the center of Oak Park and probably half way across the south track on Madison. The Oak Park

police, called by plaintiff, say that the most northerly skid mark was within the eastbound car track about a foot, or just inside of the south rail, and led in a south-easterly direction 35 or 40 feet, to the rear of the stopped bus; that the debris was about in the center of Oak Park avenue and about a foot to the south of the rails of the eastbound car track; that the skid marks commenced where the debris was, and indicated that the brakes were applied after the impact. Other evidence on behalf of plaintiff, including a plat, covered the physical conditions at and surrounding the place of the accident and the location and operation of the traffic control lights. The plat shows that when within about 75 feet of the intersection, each driver had an unobstructed view of the other if not more than a like distance from the intersection.

Defendant called seven occurrence witnesses—its driver and six passengers. The driver, 42 years of age, had had the run from Chicago to Iowa City and return since his employment by defendant in June 1933; he arrived in Iowa City at 8:04 in the morning preceding the accident, had gone to bed between 1 and 2 o'clock in the afternoon and gotten up about 10 o'clock that night; he left Iowa City at 11:30 p. m., driving the bus involved in the accident; he entered Madison street from the north at Harlem avenue, a half mile west of Oak Park; he was driving east between 20 and 25 miles an hour; there were no stop lights between Harlem and Oak Park avenues; not all the street lights on Madison street were lighted; he was probably three blocks away when he first saw the traffic light on the southwest corner in front of the drugstore at Oak Park avenue; the other light was on the northeast corner; they were red; the lights changed from red to amber—the red staying on with the amber—when he was a little more than a block from the intersection; he was just about where Grove avenue runs south—about 350 feet west of Oak Park

avenue—when he saw the lights were green for east and west traffic; he was in high or fourth speed, but dropped down to third for smoother operation; he was driving on the right-hand side of the street, with the south rail of the eastbound tracks under the center of the bus; when about 65 feet from the west curb of Oak Park at either the second or third establishment from the corner, he first saw the plaintiff's automobile about 50 or 60 feet—later changed to about 23 feet—north of the stop light on Oak Park; he kept going, and looked to the south to see if any traffic was coming on Oak Park; this was a blind corner, and he could not see a vehicle coming from the south until he got practically into the intersection; when he next saw plaintiff's automobile it was about the center of Madison street, three or four feet east of the bus and slightly to the northeast; he applied his brakes as soon as possible, but does not know where the bus was when the brakes started to take effect after the crash; it is more difficult to stop on a brick pavement than on a concrete pavement; on a dry concrete pavement, at 25 miles an hour, he would take about 36 feet to stop; at a speed of 40 miles an hour, confronted by an emergency, he could stop in about 60 to 70 feet—that is, from the time the foot brake is first applied until the bus is brought to a dead stop; when he first saw the automobile he did not see any suggestion that the driver was going through the traffic light; he assumed that the driver was going to stop because he had the red light and plenty of time to stop before he got to the stop light or curb line; he also assumed that everybody going north who had the red light would stop before he got to Madison street, but it was natural to look to his right because it was a blind corner where he could not see anything until he got within the building line; within a few hours after the collision he signed a statement prepared by the police, and which he says is true, stating: "I was going east on Madison street and when I was about

a block away the light turned green in my favor for eastbound traffic, so I dropped it into third speed and I noticed this car approaching from the north with dim lights. I immediately saw that we were going to collide, so I put on my brakes. . . . I hit this car about the center of Oak Park avenue, about in the middle of the car." At one place in his cross-examination he said he was about 25 or 30 feet from the intersection of Oak Park avenue when the light flashed green. The six passengers (Zaborowski, Lang, McKitrick (who testified by deposition), Howe, Mrs. Wermer and Miss Neyens) all testified that the bus entered the intersection on the green light; none of them saw the light change to green; when they observed the green light for Madison street, the bus, according to their respective estimates, was from 25 to 200 feet west of the intersection; Zaborowski and the driver say that the automobile went through the red light; Howe, after seeing the green light for Madison street, saw the automobile not more than 50 feet north of the north curb of Madison street; Mrs. Wermer said it was three or four car lengths from (north of) Madison street when she saw the green light for eastbound traffic; when Lang first saw the automobile it was about 40 feet from the place of the impact, or, north of the curb; Miss Neyens and McKitrick did not see the automobile before the impact. None of the witnesses placed the speed of the bus over 30 miles an hour when approaching and entering the intersection; Zaborowski, Howe and Miss Neyens fixed its speed at 20 to 25 miles an hour, as did the driver; Mrs. Wermer said it was going between 20 and 30 miles; Lang and McKitrick said approximately 30 miles. Lang and the driver testified that plaintiff's automobile was traveling about the same speed as the bus, while Howe placed its speed at 35 to 40 miles, and Zaborowski judged it was going at a pretty good speed—somewhere between 50 and 60 miles; the other witnesses did not give an

estimate of its speed. No witness testified that the speed of the automobile was diminished before the impact; Broughton, plaintiff's witness, said it was going at the same speed right up to the time of the accident; Lang said he did not notice any change in its speed. The driver of the bus did not sound his horn or give other warning of his approach. There is no evidence that plaintiff gave any warning.

Defendant's motion for a directed verdict or for judgment notwithstanding the verdict should be allowed if, when all the evidence is considered, with all reasonable inferences to be drawn therefrom in its aspect most favorable to the party against whom the motion is directed, there is a total failure to prove one or more necessary elements of the case. *Carrell v. New York Cent. R. Co.*, 384 Ill. 599; *Nelson v. Stutz Chicago Factory Branch, Inc.*, 341 Ill. 387. Under the first count of the complaint plaintiff must show not only negligence of the defendant, but also absence of contributory negligence on his part. *West Chicago St. R. Co. v. Liderman*, 187 Ill. 463; *Illinois Cent. R. Co. v. Oswald*, 338 Ill. 270. Similarly, under the second count, plaintiff cannot recover if he was guilty of wilful and wanton conduct proximately contributing to his injury. *Willgeroth v. Maddox*, 281 Ill. App. 480; Restatement of the Law of Torts, § 503 (2); *Hinkle v. Minneapolis A. & C. R. Co.*, 162 Minn. 112; *Holwerson v. St. Louis & S. Ry. Co.*, 157 Mo. 216, 241.

Plaintiff's evidence wholly failed to establish his case. It merely proved the collision of the two vehicles near the center of Oak Park avenue and in the south or eastbound track on Madison street; that each vehicle was traveling at approximately the same speed, the automobile coming to the north side of Madison street when the bus was just starting to cross Oak Park avenue; that neither driver diminished his speed up to the time of the crash, or did anything to avoid the collision until too late; that each had an unob-

structed view of the other when not more than 75 feet from the intersection; it showed that the traffic was controlled by electrically operated signal lights on which the amber light, indicating a change, appeared with the green three seconds before the change to red; it did not show what color was displayed on the lights at or before the accident; the question of liability—wrongful conduct on the part of the bus driver and lack of contributory negligence or wilful and wanton conduct on the part of plaintiff—was left entirely to speculation. Plaintiff's position was not improved at the close of all the evidence. It was then shown affirmatively, and without the slightest contradiction, that the bus entered the intersection on the green light and that it had that light when 25 feet or more from the intersection; that when the witnesses saw the green light for Madison street, plaintiff's automobile was north of the north curb of Madison street, west of Oak Park; during the three seconds that the amber light showed, plaintiff's automobile traveled 88 feet, at 20 miles an hour (the minimum speed for plaintiff's automobile shown by the evidence—20 to 25 miles being claimed by plaintiff's counsel), so that plaintiff was not less than 50 feet north of the northwest traffic signal and not less than 115 feet north of the point of impact when the amber light warned him to stop; if he was traveling at a higher speed he was a greater distance to the north when he received the warning of the amber light; the asphalt pavement on Oak Park avenue was dry; plaintiff was not driving at excessive speed, and presumably his brakes were good. He could have stopped his Ford within a few feet. *Grubb v. Illinois Terminal Co.*, 366 Ill. 330, 334. The street was free from all other traffic. In that situation plaintiff did not come within the provision of the statute regulating traffic (Ill. Rev. Stat. 1943, ch. 95½, par. 129(b) 1 [Jones Ill. Stats. Ann. 85.161, subpar. (b) 1]), which permits a vehicle to be driven cautiously through the intersection

when, on appearance of an amber light, a stop cannot be made in safety. *Landess v. Mahler*, 295 Ill. App. 498. Moreover, there is no evidence that plaintiff exercised any caution in attempting to proceed through the intersection, that he sounded his horn or gave other warning of his approach. He did not diminish his speed. There is nothing in the evidence to indicate that he was conscious of or heeded the color displayed on the traffic lights or the approaching bus until, when in a place of danger, a few feet from the point of impact, he swerved a little to the left. The law charges him with having seen the lights and the bus, both being plainly before him (*Dee v. City of Peru*, 343 Ill. 36; *Carrell v. New York Cent. R. Co.*, 384 Ill. 599), and with having knowingly entered the intersection against the lights. He had the same opportunity and was under at least the same obligation to observe his surroundings, the color displayed on the traffic lights and any approaching vehicles, as the driver of the bus. The most favorable position that can be taken in his behalf is that he was guilty of negligence or wilful and wanton conduct in whatever degree the bus driver was guilty. *Willgeroth v. Maddox*, 281 Ill. App. 480.

The trial court should have directed a verdict for defendant or have entered judgment for it notwithstanding the verdict. The judgment is reversed.

*Reversed.*

MATCHETT, J., concurs.
O'CONNOR, J., dissents.