Jack Schneiderman, Appellee, v. Interstate Transit Lines, Inc., Appellant.

Gen. No. 43,216.

Opinion filed April 21, 1947. Rehearing denied May 5, 1947.
Released for publication May 5, 1947.

DRENNAN J. SLATER, of Chicago, and THOMAS F. HAMER, for appellant.

JOSEPH D. RYAN and LOUIS P. MILLER, both of Chicago, for appellee.

MR. JUSTICE FEINBERG delivered the opinion of the court.

Plaintiff recovered a judgment for $100,000 upon a verdict of a jury in the superior court of Cook county against defendant, in an action for damages for personal injuries sustained in a collision between his automobile and a bus, owned and operated by defendant. The jury also, in response to a special interrogatory submitted at defendant's request, found that the bus had been operated in a wilful and wanton manner. The trial court overruled defendant's motion for judgment notwithstanding the verdict and for a new trial, and the motion to require a remittitur and to vacate the special verdict.

On appeal from that judgment, this court, on a prior hearing, reversed the judgment of the trial court without remanding, and held that the trial court should have directed a verdict for defendant or have entered judgment for it, notwithstanding the verdict. *Schneiderman v. Interstate Transit Lines, Inc.*, 326 Ill. App. 1. (The writer was not then a member of this court.)

On appeal to the Supreme Court, the judgment of this court was reversed and the cause remanded to this court with directions "to consider any other questions not previously considered and to either affirm the judgment or reverse it and remand the cause for a new trial." The opinion of the Supreme Court is reported in 394 Ill. 569.

The facts involved in the accident, recited in the prior opinion of this court and in the opinion of

the Supreme Court, will not, in the interest of brevity, be restated. The Supreme Court having determined that there was evidence sufficient to go to the jury respecting the liability of the defendant, there remains for this court to determine the question whether the verdict and judgment of the court are against the manifest weight of the evidence. The determination of such a question in any case involves a grave responsibility, which we are in duty bound to squarely meet and carefully discharge. Especially so, in view of the construction which the Supreme Court in its opinion has placed on much of the evidence in this record.

██ ██ In approaching the question whether the verdict and judgment are against the manifest weight of the evidence, we must apply the principle so many times stated and repeated in *Norkevich v. Atchison, T. & S. F. Ry. Co.*, 263 Ill. App. 1, wherein this court twice reversed the verdicts of juries on the sole ground that they were against the manifest weight of the evidence. Upon the third appeal, the same question was considered, the verdict was sustained, and this court said at page 15:

" 'There are many things which a jury observes on the trial in such case that do not appear from the printed record—the appearance of the respective witnesses, their manner of testifying and a great many other circumstances. They are in a much better position in such case to determine the truth of the matter in controversy than a court of review.' . . . Under the law we cannot disturb the verdict of the jury unless it is clearly against the manifest weight of the evidence. *Manifest means clearly evident, clear, plain, indisputable.*" (Italics ours.)

In *Mirich v. T. J. Forschner Contracting Co.*, 312 Ill. 343, at page 358:

"One of the recognized benefits of trial by jury is that the jury sees and hears the witnesses, which gives them superior advantage over a reviewing court in determining the credibility of the witnesses and the weight and credit that should be given their testimony."

As was aptly said by our Supreme Court in *People v. Hanisch,* 361 Ill. 465, at page 468:

"The jury, as a fact-finding body, is of such importance that an abridgment of its functions in this regard and an appropriation of them by the judges would mean the forsaking of a valued tradition in our system of jurisprudence. The utmost caution should be exercised not only by the trial courts but by the reviewing courts to uphold the sanctity of the trial by jury."

The jury having found defendant guilty of wilful and wanton misconduct, defendant is liable for these injuries, unless it can be said upon the facts that plaintiff clearly was guilty of wilful and wanton misconduct. *Walsh v. Gazin,* 316 Ill. App. 311, at page 317.

The Supreme Court in the instant case said at page 582 of their opinion:

"There is evidence from which the jury might have found that defendant's driver exhibited a wilful and wanton disregard for the safety of others."

Defendant contended in the Supreme Court that plaintiff cannot recover on the second count of the complaint, charging defendant with wilful and wanton misconduct, because plaintiff was guilty of wilful and wanton misconduct in ignoring the traffic control signal, and argued there that the evidence in the record clearly showed that plaintiff was guilty of wilful and wanton misconduct. It is significant that the Supreme Court did not say upon the evidence which they had before them that the evidence, and all reasonable in-

ferences that could be indulged in for plaintiff, clearly showed plaintiff guilty of wilful and wanton misconduct, which would bar his recovery. We had said in our first opinion, at page 14:

"The most favorable position that can be taken in his behalf is that he was guilty of negligence or wilful and wanton conduct in whatever degree the bus driver was guilty."

Had the Supreme Court been impressed by the contention of defendant and had agreed with our conclusion, above quoted, it had the power to say that the evidence, viewed in its most favorable light, for the plaintiff, about which reasonable minds could not differ, clearly established, as a matter of law, that plaintiff was guilty of contributory negligence or wilful and wanton misconduct. *Wabash Ry. Co. v. Brown,* 152 Ill. 484 at p. 488. If the Supreme Court has the power to determine, as a matter of law, with respect to the wilful and wanton misconduct of a defendant, conversely it had the power to say the same thing concerning the plaintiff. *Robertson v. New York Cent. R. Co.,* 388 Ill. 580, at page 586.

We have again carefully analyzed the evidence in this record. We cannot say that this plaintiff was guilty of wilful and wanton misconduct, which directly caused the accident in question. True, his testimony, as outlined in our prior opinion, was unsatisfactory. At times it was not coherent. This condition is clearly chargeable to the injuries inflicted upon him by the wilful and wanton misconduct of defendant. He should not be penalized because his memory has been impaired by this injury, if there are sufficient facts in this record to support his claim. This court held in its first opinion that he was not a competent witness because of his mental condition. With this conclusion

the Supreme Court did not agree, and said on that subject at page 578:

"We have referred to the record to study the exact language employed by plaintiff in making his answers and, in view of such answers and in the light of evidence of medical experts as to the character of his mental ailment and the effect it has had on his powers of speech, we conclude that he was competent to testify and that the Appellate Court erred in rejecting his testimony *in toto*. The discrepancies in answers given to the same or similar questions to a great measure indicate lack of control of the power of speech and under the circumstances shown it was for the jury to determine which answers would be given greater weight."

At page 576, the Supreme Court said:

"A fair sample of such incoherent and meaningless testimony is set forth in the Appellate Court opinion. . . . *On the other hand, some of his answers are corroborated by other credible evidence.*" (Italics ours.)

The contention of defendant that plaintiff is also guilty of wilful and wanton misconduct is predicated upon his alleged violation of the statute (§ 32 (a) of the Uniform Traffic Act, ch. 95½, par. 129, Ill. Rev. Stat. 1945 [Jones Ill. Stats. Ann. 85.161]), claiming that plaintiff entered the intersection where the accident occurred against the red light.

The section in question, the Supreme Court, at page 579, said:

". . . prescribes the rule by which traffic is moved at street intersections controlled by automatic stop-and-go lights. It directs that when the color green is exhibited, the traffic facing it shall move forward into the intersection. Such right of way, however, is sub-

ject to the provisions that the one advancing into the intersection with the green light 'shall yield the right-of-way to other vehicle . . . lawfully within the intersection at the time such signal is exhibited.' The second division of paragraph (a) prescribes the duty of the driver who approaches the intersection when the yellow light following the green is exhibited. It directs that when the yellow light flashes in front of him, he shall stop before entering the nearest cross-walk at the intersection 'but if such stop can not be made in safety, a vehicle may be driven cautiously through the intersection.' "

Plaintiff, at one place in his testimony, claimed that he did not enter the intersection against the red light, that it was green. At another place he claims it was amber. If it was amber when he entered the intersection, then that portion of the section of the statute applies which reads that when the yellow light flashes in front of him, he shall stop before entering the nearest crosswalk, *"but if such stop cannot be made in safety, a vehicle may be driven cautiously through the intersection."* (Italics ours.)

In reviewing the testimony of the witnesses for defendant, who were passengers on the bus, their credibility being essentially a question for the jury, we find important discrepancies and contradictions, a fact pointed out by the Supreme Court in their review of the evidence on page 581. These witnesses had been riding continuously on a bus up to the time of the accident, from various distant points, such as California, Wyoming, Denver and Nebraska. Some of them were sleepy, tired; others were sitting in a crouched position in their seat. Whether they actually saw the lights and correctly knew the speed of the bus and the automobile, and the distances, about all of which they testified in detail, was within the province of the jury to judge and determine. We believe that the physical facts involved in the accident

are more convincing than the testimony of some of these witnesses. It is clear to us that the point of impact was at the southwest portion of the intersection of Madison street and Oak Park avenue, and near the south curb line of Madison street, upon which the bus was traveling in an easterly direction. The plaintiff was driving in a southerly direction on the west side of Oak Park avenue. The witness Lang, for defendant, testified that the left wheels of the bus, as it approached the intersection, were straddling the south rail of the eastbound street car tracks; that the greater part of the bus was south of the rails. If this testimony is true, which was for the jury to determine, and the automobile and the bus were traveling at about the same speed, as testified to by the driver and pointed out by the Supreme Court in its opinion, then it is certain that the automobile must have entered the intersection before the bus did. If plaintiff entered the intersection when the amber light was showing, he had a right, if he thought he could not stop in safety, to drive cautiously through the intersection, as provided for in the section of the statute quoted. The Supreme Court said, at page 582:

"It became a question for the jury to determine whether plaintiff entered the intersection on the green light or whether he entered it on the amber following the green or whether he drove into the intersection against the red light. If he drove into the intersection on the green light as he stated, then defendant's bus did not have the right of way. If he drove into the intersection when the amber light was exhibited with the green, then if plaintiff was in such position with his car that he could not safely stop, he had the right to proceed cautiously across the intersection and *defendant was under the duty to allow the right of way to him.*" (Italics ours.)

Since the Supreme Court has concluded that there is some corroboration by other credible evidence of some of plaintiff's testimony, this physical fact as to the place of impact is, considered with all the other circumstances in evidence, in our judgment, sufficient proof that plaintiff entered the intersection while the amber light was showing. The defendant did nothing to slow down the speed of his bus and failed utterly in his control of the bus to give the right of way to plaintiff, as allowed by statute.

We cannot say upon this record that the verdict of the jury and the judgment of the court are against the manifest weight of the evidence.

Since the remandment of the case to this court, defendant has cited an additional authority, *People v. Arcabascio*, 395 Ill. 487, in support of its contention that instructions Nos. 9 and 10 are erroneous. We have again examined these instructions, and we have concluded that the cases cited by defendant do not apply to the instructions in question. In the *Arcabascio* case, it was pointed out that the jury was compelled to search through many instructions to ascertain what the material issues were. That is not true in the instant case. Instruction No. 1 for plaintiff was complete in defining all the material issues in the case, and therefore, the instructions in question are not subject to the same criticism leveled at the instruction in the *Arcabascio* case. *Kavanaugh v. Washburn,* 320 Ill. App. 250, at p. 253; *Hannaher v. Blue Cab Co., Inc.,* 322 Ill. App. 277.

We find no reversible error in this record. We believe defendant has had a fair trial. The judgment of the superior court accordingly is affirmed.

*Affirmed.*

O'CONNOR, P.J., concurs.
NIEMEYER, J., dissents.

(See next page.)

The majority opinion misconceives the jurisdiction of the Supreme court on the appeal from the former decision of this court, misconstrues the opinion of that court and ignores the evidence.

On the appeal from the judgment of this court the Supreme court was limited to an examination of the case as to questions of law only. Civil Practice Act, sec. 92 (3)b [Ill. Rev. Stat. 1945, Ch. 110, par. 216, subpar. 3 (b); Jones Ill. Stats. Ann. 104.092, subpar. 3 (b)]. The contention that the judgment is contrary to the manifest weight of the evidence was not open to consideration in the Supreme court. *Liska v. Chicago Rys. Co.,* 318 Ill. 570, 584; *Pollard v. Broadway Cent. Hotel Corp.,* 353 Ill. 312, 323; *Toombs v. Lewis,* 362 Ill. 181, 190. The Supreme court could not weigh the evidence to determine where the preponderance lies. *Hunt v. Vermilion County Children's Home,* 381 Ill. 29; *Peters v. Peters,* 376 Ill. 237; *Neering v. Illinois Cent. R. Co.,* 383 Ill. 366. It could consider only evidence favorable to plaintiff's case (*Tidholm v. Tidholm,* 391 Ill. 19), even though upon the entire record the evidence preponderates against the plaintiff so that the verdict in his favor cannot be sustained. *Merlo v. Public Service Co.,* 381 Ill. 300. The court was obliged to accept as true the evidence favoring plaintiff's case. *Pollard v. Broadway Cent. Hotel Corp., supra; Toombs v. Lewis, supra.* The Supreme court recognized this limitation on its power to review the evidence in the instant case (p. 581). The opinion of the Supreme court, therefore, must be construed in the light of the questions within the jurisdiction of the court submitted on the appeal. *People v. Kennedy,* 367 Ill. 236, 241; *People v. Grant,* 208 Ill. App. 235, 242; *Yedor v. Chicago City Bank & Trust Co.,* 323 Ill. App. 42, 49–50. Thus construed, any statement as to what is established by the evidence must be held to mean only what is shown by the evidence most favorable to plaintiff, taken as true and without consid-

eration of contradictory evidence however convincing. The broader and unwarranted interpretation given the opinion by the majority of this court invades our jurisdiction and denies our right to determine whether the judgment is against the manifest weight of the evidence, free and unhampered by any expression of opinion by the Supreme court as to the weight of the evidence. We cannot impute to the Supreme court an intent to exceed its jurisdiction. The Supreme court intended to and, under a proper construction of its opinion, did leave us entirely free to determine the question now before us.

Turning to consideration of all the evidence, reference must be had to the former opinion of the court (326 Ill. App. 1) for a statement of the evidence as to the physical conditions at the scene of the collision, the location and operation of the traffic lights, injuries sustained by the plaintiff and the resulting difficulties and handicaps in his efforts to testify, and for other matters not discussed in this dissent. Having held in our former opinion that plaintiff was not a competent witness, we disregarded his testimony except to quote part of it to show its incoherency. The Supreme court, reversing our judgment, held that plaintiff is a competent witness. We now, for the first time, weigh his testimony to determine its evidentiary value. The majority of the court, taking the position that the Supreme court has determined certain questions of fact for us, does not review the evidence. Such review must be made in this dissent, thereby unduly extending it.

The plaintiff and Broughton, the latter a passenger on the bus, were the only occurrence witnesses called by plaintiff. The defendant called seven occurrence witnesses—the driver of the bus and six passengers: Zaborowski, Lang, McKittrick, who testified by deposition; Howe, Mrs. Wermer and Miss Neyens. The evidence on plaintiff's behalf establishes that the im-

pact between the automobile and the bus occurred near the center of Oak Park avenue in the westerly half of the street and in the eastbound street car track on Madison street. Broughton so testified. The Oak Park police called by plaintiff say that the debris from the collision was about the center of Oak Park avenue and about a foot south of the eastbound street car track; that the most northerly skid mark caused by the rear wheels of the bus, on application of the brakes an instant before or after the collision, was between the rails of the eastbound track approximately a foot from the south rail. All witnesses agree that plaintiff was driving in the southbound lane of Oak Park avenue and swerved only slightly just before the impact. The driver and Lang testified that the bus straddled the south rail of the eastbound track as it approached the intersection. All witnesses agree that the direction of the bus was not changed until after the collision when the driver swerved to the right. In reaching the place of impact the automobile traveled 10 or possibly 15 feet farther into the intersection than the bus.

The testimony as to the speed in miles per hour of the two vehicles as they approached and entered the intersection shows a variance in the estimates of speed usually found in testimony of this character. Plaintiff testified that he was traveling 20 to 25 miles per hour. Broughton formed no judgment as to the speed of the automobile. Howe placed its speed at 35 to 40 miles, and Zaborowski at between 50 and 60 miles. Neither Broughton nor any of the seven witnesses called by defendant placed the speed of the bus above 30 miles an hour, although Lang on cross-examination said in answer to a question as to whether the bus might have been going 40 miles an hour, that his judgment might have been off that much. He further testified, as did the driver, that the two vehicles were traveling about the same speed. The driver gave his speed as 20 to 25 miles an hour. Zaborowski, Wermer

and Howe give 20 miles an hour as their lowest esti-
mate of the speed of the bus.

All the witnesses except Zaborowski and Lang agree
that in approaching the intersection the two vehicles
were practically equally distant from it. Plaintiff tes-
tified that when he was 40 to 50 feet from the crossing
he saw the bus about the same distance from the
corner. Broughton said that when the automobile
came to the north side of Madison street he thought
the bus probably was just starting to cross Oak Park.
The testimony of defendant's witnesses, with the ex-
ception of Zaborowski and Lang, corroborates this
testimony of plaintiff and his witness. The driver
testified that when in the neighborhood of 60 feet from
the west curb of Oak Park avenue he saw the auto-
mobile 50 or 60 feet (later changed to about 23 feet)
north of the stop light on Oak Park avenue. This light
was 33 feet north of the north curb line of Madison
street. Howe first noticed the green light for Madison
street when 75 to 80 feet from Oak Park avenue, and
after that saw the automobile 50 feet north of the north
curb line of Madison street. Mrs. Wermer first noticed
the automobile three or four automobile lengths north
of Madison street when the bus was about the length
of the bus (33 feet) from the crossing. McKittrick
and Miss Neyens did not see the automobile until after
the collision. Zaborowski testified that the automobile
was 150 feet north of Madison street when the bus was
50 to 75 feet west of Oak Park avenue. This statement
is consistent with his testimony that the bus was travel-
ing 20 to 25 miles an hour and the automobile between
50 to 60 miles an hour. Lang, consistently with his
testimony that the two vehicles were traveling about
the same speed, placed them practically equally dis-
tant from the place of impact. He testified that when
the front of the bus was about 30 to 35 feet from the
place of impact he first noticed the automobile about
40 feet from the place of impact; that the bus was

about 25 feet from the Oak Park curb line when he first saw the light red for Oak Park (after it had changed), and the automobile was then a little bit north of the north curb line of Madison street. This testimony of all the witnesses except Zaborowski, that the two vehicles in approaching the intersection were practically equally distant from the intersection, and Lang's testimony that the two vehicles were practically equally distant from the place of impact, proves that they were traveling at substantially the same speed, as Lang and the driver had testified. As the automobile traveled a greater distance in the intersection to the place of impact, it was either a little nearer the intersection or it was traveling at a slightly higher speed, or it was nearer and also traveling faster. However, the difference is not important, and the probability of error in judgment as to distance and speed is the same. Greater accuracy is not obtainable or necessary. The testimony of all the witnesses except Zaborowski and Lang also proves that when the traffic lights changed the two vehicles were practically equally distant from the intersection.

The only conflict in the evidence as to a material fact is in connection with the color of the light displayed on the traffic lights. It arises from a single statement of the plaintiff that he had the green light as he approached and reached the intersection. In considering the entry of a judgment notwithstanding the verdict—the Supreme court having declared plaintiff to be a competent witness—that statement of plaintiff had to be taken as true. The contradiction of it in plaintiff's testimony and by testimony of other witnesses had to be disregarded. The conflict, therefore, necessitated submission of the case to the jury on the question of the right of way through the intersection. In examining all the evidence to determine whether the judgment is against the manifest weight of the evidence, that conflict vanishes.

Traffic at the intersection was regulated by electrically operated signals on a sixty second cycle. The green light for Madison street showed 33 seconds, the last three seconds with the amber, and for Oak Park avenue the green light showed 27 seconds, the last three seconds with the amber. The red light for Madison street showed 27 seconds and for Oak Park avenue 33 seconds, the amber light appearing with the red for one second only before the change to green. When the green light appeared on one street the red light appeared on the other. The only evidence on plaintiff's behalf as to color of the lights is the testimony of plaintiff. Broughton did not notice the color of the lights. Plaintiff testified on direct examination that the light was green as he approached and reached the intersection. Twice on cross-examination he said that the green light went off and the amber came on when he was in the middle of the block between Washington and Madison streets. This would be about 340 feet north of the intersection. As the amber light plaintiff saw indicated a change to the red light for Oak Park avenue there would be a 36 second interval before the green light for that street appeared again, during which plaintiff, proceeding at not less than 20 miles an hour, as he testified, would have traveled 1,068 feet, or far beyond the intersection before the reappearance of the green light. If he received the amber light 340 feet north of the intersection he got the red light when approximately 250 feet north and entered the intersection on the red light. His statements are in irreconcilable conflict. One cancels the other and the testimony has no probative value. *United States Fidelity & Guaranty Co. v. Continental Baking Co.*, 172 Md. 24, 190 Atl. 768. There is therefore no credible evidence that plaintiff entered the intersection on the green light. There is no evidence that he entered it on the amber light.

The testimony of every witness called by the defendant shows that plaintiff entered the intersection on the red light. None of the six passengers saw the red light for Madison street change to green. All except Lang testified that they first observed the green light when the bus was west of the intersection, according to their respective estimates from 70 to 200 feet, and that the bus came into the intersection on the green light. Lang observed that the light on the northwest corner displayed the red light for Oak Park avenue—making the light for Madison street green, when the bus was about 25 feet from Oak Park avenue. The testimony of the driver corroborates the testimony of these witnesses, that the bus entered the intersection on the green light. Except for one answer on cross-examination his testimony corroborates their testimony that the light was green when they first observed it at the respective distances from the intersection testified to by them. Within a few hours after the collision the driver gave a signed statement to the police in which he said that when he was about a block (a short block, approximately 350 feet) away the red light turned to green for eastbound traffic. He testified to the same effect on direct and cross-examination. On cross-examination he said once that he was about 25 or 30 feet from Oak Park avenue when the light changed. Apparently no one at the trial understood the driver's answer as it appears in the record. Immediately after the answer and throughout his further cross-examination counsel for plaintiff assumed in his questions that the testimony of the witness was that the light had changed when he was about 300 feet or more from Oak Park avenue, and in his answers to the questions asked by plaintiff's counsel the witness reiterated that he had received the green light 300 feet or more from Oak Park avenue, and stated that his statement to the police was true. The driver's statement to the police and his testimony consistent with

that statement are corroborated by the testimony of the six passengers and by plaintiff's repeated statement on cross-examination that he received the amber light following the green for Oak Park avenue in the middle of the block between Washington and Madison streets. The driver's reiterated statements thus corroborated should not be rejected because of an inadvertent answer, unnoticed by everyone including plaintiff's counsel. Whatever construction may be given to the driver's testimony, the undisputed fact remains that there is no testimony, fact or circumstance in evidence—except the statement of the plaintiff that he had the green light as he approached and reached the intersection, canceled by his repeated statement that he got the amber light when he was in the middle of the block—contradicting the testimony of the six passengers or the driver's statement to the police, or raising any reasonable inference that the bus did not enter the intersection on the green light. If the jury arbitrarily rejected all the driver's testimony, there remains the testimony of the six passengers that the bus had the green light when not less than 25 or 30 feet from Oak Park avenue.

The majority opinion says that there is ''sufficient proof that plaintiff entered the intersection while the amber light was showing.'' There is nothing in the record to support this conclusion. Plaintiff does not say that he entered on the amber light. According to his testimony he either received the amber light approximately 340 feet north of the intersection, when as shown above he would have entered and passed through the intersection on the red light, or he received the amber light after entering the intersection. After stating on direct examination that the light was green as he approached and reached the intersection, his counsel immediately asked, ''What happened as you were going over? Tell us what happened. Tell the jury what happened.'' He answered, ''Green and

amber. Amber, and bus struck.'' If this answer be considered as a statement that he got the amber light ''going over'' the intersection, he did not enter the intersection on the amber light. Broughton testified that he did not see the color of the lights. There are no physical facts in evidence showing what light was displayed when the vehicles entered the intersection. Since the traffic lights did not freeze as the vehicles crossed the intersection line, it is difficult to conceive how physical facts could establish the color of the lights. Proof of that fact must be based on oral testimony and mathematical calculations. Every witness for defendant says that the bus entered the intersection on the green light. No witness testifies that the bus was closer to the intersection than 25 to 30 feet when the green light was observed. There is testimony that it got the green light as far back as the neighborhood of Grove street, about 350 feet. No witness testifies that the automobile entered the intersection ahead of the bus. Broughton, plaintiff's witness, and Lang, called by defendant, observed the vehicles nearer to the intersection than any other witness. Broughton says that when the automobile came to the north side of Madison street he thought the bus probably was starting to cross Oak Park avenue. At that time, according to testimony most favorable to plaintiff, the bus had had the green light while traveling not less than 25 or 30 feet, during which time the automobile, just coming to the north side, had had the red light. Lang says that when he observed the light red for Oak Park (it had already changed), the bus was about 25 feet from the curb line of Oak Park avenue and the automobile a little bit north of the north curb line of Madison street. Plaintiff therefore entered the intersection on the red light.

A further contention is made in plaintiff's behalf that if he did not enter the intersection on the amber light, he was so close to the intersection when the amber light appeared that he could not stop in safety

and consequently was entitled to proceed cautiously through the intersection. The rights and duties of drivers of vehicles at intersections controlled by traffic lights are governed by section 32 of the Uniform Traffic Act. (Ill. Rev. Stat. 1945, chap. 95½, par. 129 [Jones Ill. Stats. Ann. 85.161].) That section provides that traffic receiving the green light "shall yield the right-of-way to other vehicles and to pedestrians lawfully within the intersection at the time such signal is exhibited," and that traffic receiving the amber light following the green "shall stop before entering the nearest crosswalk at the intersection, but if such stop cannot be made in safety, a vehicle may be driven cautiously through the intersection." In construing this section of the statute the Supreme court in the instant case (p. 579) said: "The second division of paragraph (a) prescribes the duty of the driver who approaches the intersection when the yellow light following the green is exhibited. It directs that when the yellow light flashes in front of him, he shall stop before entering the nearest cross-walk at the intersection, 'but if such stop can not be made in safety, a vehicle may be driven cautiously through the intersection.'" In *Landess v. Mahler,* 295 Ill. App. 498, this court considered the same provision of the statute. Mr. Justice McSurely, speaking for a unanimous court, said (p. 503): "This manifestly applies to a situation where there is traffic immediately following the first vehicle approaching the intersection or when it is so near that an abrupt stop could not be made in safety. . . . This statute has no application to the circumstances here presented. There was no traffic following plaintiff's car. The greater weight of the evidence tends to show that he could have stopped in safety when the yellow light went on, and he did not proceed cautiously into the intersection." The judgment was reversed as against the manifest weight of the evidence.

The burden of bringing himself within the protection of the statute is upon plaintiff. On plaintiff's testimony that he was 340 feet from the intersection when he received the amber light, no claim that a stop could not be made in safety can be urged. On a strained construction of the evidence most favorable to plaintiff, but contrary to the great weight of the evidence, that the bus did not get the green light until within 25 or 30 feet west of the intersection, plaintiff cannot bring himself within the statute as the evidence does not show that he could not have stopped in safety before entering the nearest crosswalk and that he proceeded cautiously through the intersection. When the bus was about 25 feet from the intersection, Lang, who places plaintiff nearest to the intersection at that time, says that the automobile was a little bit north of the north curb line of Madison street. At that time plaintiff had the red light for Oak Park avenue and had received the amber light not less than three seconds before. He was therefore a "little bit" more than 88 feet north of the intersection when the amber light flashed for him. According to all the remaining witnesses, including plaintiff and Broughton but excepting Zaborowski, the two vehicles were practically equally distant from the intersection, and plaintiff was about 113 feet north of the intersection when the amber light appeared. Zaborowski said plaintiff entered the intersection through the red light. Plaintiff therefore was not less than approximately 90 feet north of the intersection and about 55 feet north of the northwest stop light or nearest crosswalk when the amber light following the green light appeared for Oak Park avenue. According to the greater weight of the evidence he was approximately 25 feet farther north of the intersection and stop light.

There was no traffic, vehicular or pedestrian, at or near the intersection as the two vehicles approached and entered it. The asphalt pavement on Oak Park

avenue was dry. Plaintiff was driving a Ford. The brakes were in good condition. He testified that traveling at 20 to 25 miles an hour he could stop in 3 or 4 feet. In *Grubb v. Illinois Terminal Co.*, 366 Ill. 330, in speaking of a Ford automobile, the court said (p. 334): "It is a matter of common knowledge that a small automobile of the type here involved, when going at the rate of 20 miles an hour, with brake mechanism in good condition, can be stopped within a few feet." Plaintiff testified that he applied his brakes. His testimony by question and answer follows: "Q. You turned left on Oak Park avenue, did you? But I am asking, when you saw the light was amber a half block from the corner, did you put on your brakes after that? A. I—no. Q. You didn't put your brakes on at all up until the accident? A. No, no, I did, and bus— Q. But I am not asking about the bus. I am asking if you put your brakes on. You didn't put your brakes on at all, did you? A. Yes. Q. When did you put your brakes on? A. Right away. Q. Half a block back? A. No, amber, and bus just— Q. How close to the corner were you when you put your brakes on? A. Madison street and Oak Park, it was. Q. Do you remember putting your brakes on at all? A. Yes. Q. Do you remember seeing the traffic signal on the northwest corner of Oak Park and Madison, do you remember the traffic light? A. Yes. Q. You don't remember the traffic light? A. Yes, yes. Q. How close to the traffic light were you when you put your brakes on? A. (No answer.) Q. Did you put your brakes on before you got to the traffic light? A. No. Q. Did you try to stop your car at all before you got to the traffic light? A. (No answer.) . . . Q. How close to the bus were you when you put your brakes on? A. I don't remember. Q. Did your car skid when you put the brakes on? A. Yes. Q. Do you know how far you skidded? A. Left. Q. You skidded to the left? A. No, I—I don't— . . . Q. Let me

ask you this once more so that I understand it. How far from the place where the accident happened was your car when you put the brakes on, about how many feet? A. I don't really know.'' From this testimony it appears that he did not put on his brakes after he saw the amber light a half block from the corner; that he put them on right away; that he did not put them on before he got to the traffic light (33 feet north of the north curb line of Madison street); that he does not remember how close to the bus he was when he put his brakes on; that he does not really know how far from the place of the accident he was when he put on his brakes; that the car skidded to the left when he put on his brakes, and that it did not skid to the left. Broughton testified that the automobile swerved a little to the left a little before the center of the intersection. Zaborowski said that the front of the automobile was just past the center line of the intersection when it started to swerve to the left. If the swerving of the automobile was due to the application of the brakes, plaintiff did not apply his brakes until within 10 feet or less from the place of impact. He was then 15 feet or more into the intersection and had traveled approximately 105 to 130 feet after receiving the amber light. Being not less than about 55 feet north of the north stop light when the amber light appeared, he was not so close to the nearest crosswalk that an abrupt stop was required. No traffic interfered with or prevented the immediate stopping of his automobile. With brakes in good condition, the pavement dry and his speed at 20 to 25 miles an hour, there is nothing in the evidence to indicate that a sudden or abrupt stop would be unsafe. No other fact or circumstance in evidence has been suggested making it unsafe to stop before reaching the nearest crosswalk. He did not proceed cautiously through the intersection. When 40 to 50 feet north of the intersection he saw the bus the same distance west of the intersection. There is

no evidence that he again looked toward the bus or saw it until the instant before the impact when the collision was inevitable. He did not reduce his speed. He entered the intersection without blowing his horn or giving other warning of his presence or intention to proceed through the intersection. If he applied his brakes he did so when too close to the approaching bus to be effective. As hereafter shown, the Supreme court held that like conduct on the part of the driver was evidence tending to show wilful and wanton conduct. For the reason stated in *Landess v. Mahler, supra,* the statute has no application to the circumstances shown by the evidence in this case, and plaintiff was not lawfully within the intersection.

The Supreme court has held that there is evidence from which the jury might have found that the driver was guilty of wilful and wanton conduct, citing in support of the holding that the driver's right of way through the intersection was a question of fact for the jury, and the testimony of the driver that when about 65 feet west of the intersection he saw plaintiff's automobile approaching from the north, he did not reduce his speed, he looked to the right and did not again observe plaintiff's automobile until it was 3 or 4 feet from him, an instant before the collision; that he did not apply his brakes until that time. As heretofore noted, that ruling is based only on the evidence most favorable to plaintiff, taken as true, and without consideration of evidence favorable to defendant. Ignoring the question of whether the evidence as a whole would justify a finding that the driver was guilty of wilful and wanton conduct, the conduct of plaintiff, shown above, parallels that of the driver. Each had the same opportunity to observe the other, the physical conditions and the traffic lights at the intersection; each ignored the presence of the other until the instant before the impact when the collision was inevitable; each was under the same duty to exercise care and

caution, except as the driver's right of way through the intersection, established by the overwhelming weight of the evidence, gave the driver protection. Neither slackened his speed and neither applied his brakes until too close to the place of impact to be effective in preventing the collision; neither sounded a horn or gave other evidence of his approach. If either was guilty of negligence or of wilful and wanton conduct, the other was likewise guilty. *Willgeroth v. Maddox,* 281 Ill. App. 480.

The overwhelming evidence outlined above, showing that plaintiff entered the intersection on the red light without lawful right and was equally guilty with, if not more guilty than the driver of the bus of negligence or wilful and wanton conduct in causing the collision, is disposed of in the majority opinion by holding that the rejection or acceptance of the testimony of the six passenger witnesses was a matter entirely in the province of the jury. Thus the majority opinion says that in the testimony of these witnesses ''we find important discrepancies and contradictions.'' None are pointed out. The writer of this dissent does not find any, except such discrepancies and contradictions as may be expected in the testimony of any lay witness testifying at length some time after the occurrence concerning which he is interrogated and subjected to a vigorous cross-examination. Certainly there are no such glaring and important discrepancies and contradictions as are found in the accepted testimony of the plaintiff. Is the court straining at a gnat and swallowing a camel?

This alleged defect in the testimony of the passenger witnesses, and other alleged defects hereafter discussed, relied upon by the majority of the court to sustain the verdict of the jury, are defects which if they exist must be found in the testimony of the individual witnesses, and are not likely to be common to the testimony of the group as a whole. The passenger wit-

nesses are apparently disinterested, performing a duty imposed by law and justice of telling in their own way what they saw and heard. They are citizens of different communities and states, engaged in various lawful occupations—three being soldiers in the service, strangers to each other until the bus trip on which the collision occurred and without further contact with each other except when appearing as witnesses. They are at least of average intelligence, without defect of mind or speech interfering with their testimony. They should not as a group be branded as persons whose testimony is unworthy of belief without specification of defects shown to be applicable to all. It is further said in the majority opinion, "Whether they (the passenger witnesses) actually saw the lights and correctly knew the speed of the bus and the automobile, and the distances, about all of which they testified in detail, was within the province of the jury to judge and determine." The right of jurors and judges to reject the testimony of a witness is not an arbitrary and unlimited right. As said in *Larson v. Glos,* 235 Ill. 584, "Where the testimony of a witness is uncontradicted, either by positive testimony or by circumstances, either intrinsic or extrinsic, and the witness is not impeached, the testimony cannot be rejected even by a jury." It is only testimony that is inherently improbable, contrary to the laws of nature or containing its own impeachment, such as self-contradiction, that may be rejected in the absence of conflicting evidence. *People v. Davis,* 269 Ill. 256, 270–271; *Schueler v. Blomstrand,* 394 Ill. 600, and cases cited. However strongly the majority of the court may feel, or the jurors may have felt, that the passenger witnesses should have been asleep at the time they testified that they were awake, and that they were in a crouched position looking from inside the bus, the fact remains that it is not inherently improbable that they or any other passenger should have been awake at the time

of the collision or any other hour of the day or night, and it is not against the laws of nature that wide awake passengers, sitting up in their seats (not crouched as the opinion says), should see traffic lights and other objects ahead and to the side of the bus. It is a matter of common knowledge that interstate passenger buses, competing with railways, are designed to give every passenger in a seat the greatest possible vision, consistent with the practical construction and operation of the bus, alongside and ahead of the bus. Plaintiff's exhibits—police photographs taken at the scene of the collision and immediately after it—show that the curtains of the bus were drawn back, giving ample vision through the windows. Each witness testified that he was awake, sitting up in his seat;. that he saw the lights designated by him, and the relative positions of the two vehicles. One witness testified that vision of a certain light was obstructed by a partitioned window. Others testified that they could not see certain lights. Two of the witnesses testified that they did not see the automobile until after the collision. There is nothing in the evidence tending to show that the witnesses were not awake and sitting up and that they could not or did not see the things about which they testified. Neither surmise and conjecture, nor sympathy for the unfortunate plaintiff, can supply evidence to justify rejection of positive testimony of credible witnesses. There is nothing in the testimony of these witnesses as to what they saw that would justify rejection .of the testimony. As heretofore shown, they saw practically eye to eye with plaintiff, and Broughton his witness, as to the relative positions of the two vehicles and their distances from the intersection. The conclusion that the two vehicles were traveling at substantially the same speed is deducible alike from the testimony of the passenger witnesses and from that of plaintiff and Broughton. The testimony of five passenger witnesses that they saw the

green light for eastbound traffic on Madison street, and of Lang that he saw the red light for traffic on Oak Park avenue, is consistent with the driver's statement to the police within a few hours of the collision that he got the green light for eastbound traffic when in the neighborhood of Grove street, which is about 350 feet west of Oak Park avenue, and his testimony supporting that statement. It is also consistent with the repeated statement of plaintiff that when about the middle of the block, or 340 feet north of the intersection, the green light went off and the amber light appeared for traffic on Oak Park avenue.

Although the majority opinion states, "We believe that the physical facts involved in the accident are more convincing than the testimony of some of these witnesses," the court again resorts to a general statement (a prerogative sometimes abused) and does not specify any physical fact which should overcome the oral testimony of so many unimpeached witnesses. However, if, as the majority opinion suggests, the testimony of these witnesses as to the speed of the vehicles, the distances and the lights were rejected, the plaintiff could not be benefited. If the testimony of these witnesses as to speed and distances be rejected, the facts proved by their testimony, namely that the vehicles were approaching from approximately equal distances and at substantially the same speed, would still stand—being proved by the testimony of plaintiff, his witness Broughton, and the driver. If the testimony of the passenger witnesses as to the lights be rejected, then the facts established by their testimony is, nevertheless, proved by the testimony of the driver —contradicted only by the self-contradictory and valueless testimony of the plaintiff. Surely the plaintiff's testimony cannot establish the burden of proof resting on plaintiff to show his lawful entry into the intersection. Furthermore, there still stands plaintiff's testimony as to his conduct in approaching and

entering the intersection, which conduct parallels that of the driver and proves plaintiff guilty of whatever negligence or wilful and wanton conduct may be established against the driver, and plaintiff is not entitled to recover.

It is the duty of this court to set aside verdicts and judgments which are clearly against the manifest weight of the evidence (*Chicago & E. R. Co. v. Meech,* 163 Ill. 305), and ". . . it is not necessary that it should further appear that it (the verdict) was not the result of the impartial and honest judgment of the jury, nor that it resulted from prejudice, passion or some improper motive or condition." *Donelson v. East St. Louis & Suburban Ry. Co.,* 235 Ill. 625, 628. This unjust verdict—a triumph of sympathy over reason, a glaring weakness of jury trials—is against the manifest weight of the evidence and should be set aside and the cause remanded.