CHARLES M. KENNEY, Admr. of the Estate of Harold E. Vanderpool, Deceased, *et al.*, Plaintiffs and Counterdefendants-Appellants, *v.* CHURCHILL TRUCK LINES, INC., Defendant and Counterclaimant-Appellee— (JOHN E. STUART *et al.*, Defendants and Counterdefendants-Appellants.)

(No. 11418;

Fourth District—August 2, 1972.

*Modified upon denial of rehearing September 7, 1972.*

Sorling, Catron and Hardin, of Springfield, (George W. Cullen and Patrick V. Reilly, of counsel,) for appellants.

Giffin, Winning, Lindner, Newkirk & Cohen, of Springfield, (Alfred F. Newkirk, of counsel,) for appellee.

Graham & Graham, of Springfield, for John E. Stuart, Terry Curtis, and A. J. Curtis Co.

OPINION MODIFIED UPON DENIAL OF
PETITION FOR REHEARING

Mr. JUSTICE MILLS delivered the opinion of the court:

On a rainy night in August at about 4:00 o'clock A.M. on U.S. Route 36-54 in Scott County, a few hundred feet west of its junction with Illinois Route 100, two tractor-trailer units collided. One of the drivers was killed and both rigs were demolished.

Although there was conflicting testimony as to certain facts, the circumstances surrounding the accident can be boiled down as follows: A tractor-trailer unit owned by Mid-American was heading east, driven by Vanderpool (who was killed in the accident and whose administrator is Kenney), and a similar unit owned by Churchill (driven by Hicks) was going west. Both Vanderpool and Hicks were able and experienced truck drivers—for over 20 and 30 years respectively. Traveling east behind Mid-American was an automobile owned by A. J. Curtis Co. in which two young men were riding, Stuart behind the wheel and Curtis in the back seat dozing or sleeping. Mid-American was enroute from Kansas City, Missouri, to deliver his load in Chicago. And Churchill had left Chicago the evening before and was headed for Chillicothe, Missouri, a route that he regularly traveled in his employment. Curtis and Stuart had begun their trip in Golden, Colorado, heading for Pennsylvania, and had been on the road a straight 26 hours. Just 18 miles before the site of the collision, Curtis, who had been driving nonstop for the entire journey, got into the back seat and Stuart took the wheel.

Vanderpool was killed, so there were only three surviving eye-witnesses: Stuart, Curtis, and Hicks. Stuart testified that he had been following Mid-American for about 10 miles and started to pass. As he was passing, Mid-American's brake light went on and he pulled around Mid-American at a speed of about 40 m.p.h. When he could see the headlights of Mid-American in his rearview mirror, he started to pull back to the right after passing. When he was about two-thirds of the way back into his own lane, his car began to spin counterclockwise and he ended up

on the north (opposite) shoulder of the highway, now headed in the direction from which he came. He said that as he was passing, and when he was out of control, he saw no headlights approaching from the opposite direction going west.

Curtis had been driving for better than 24 straight hours on the long trip from Colorado and just a few miles before the scene of the accident he had turned the wheel over to Stuart, got in the back seat and was either asleep or dozing. He was awakened by the splash of water on the right windows of their car and looked out while Stuart was passing Mid-American. As their car started to pull back into their lane, it went out of control, spinning counterclockwise, coming to rest on the opposite side of the highway, facing the opposite direction. Curtis looked out the rear after the car came to a halt and saw the headlights of the Churchill unit approaching from the east. During the act of passing he did not see any headlights approaching from the east either. Neither Stuart nor Curtis heard or saw the impact.

Churchill's driver, Hicks, testified that he had left Chicago the evening before and that it had been raining all evening and into the morning in question. As he approached the junction near the point of impact, there was a slight upgrade to the east of the junction that then declined into downgrade just west of the junction. As he was approaching, his speed was 40-45 miles per hour, and he noticed some headlights which disappeared and then reappeared. Upon their reappearance he recognized the headlights as those of a tractor-trailer unit since he could see the clearance lights on the trailer. Shortly thereafter, he observed a second set of headlights, those of the Curtis car, pull out from behind Mid-American and start to pass. Mid-American at this point was 400-500 feet away from Churchill. Hicks then decelerated, "braked it just a little" and then continued. The Curtis car came around Mid-American, cut in sharply in front of Mid-American, appeared to go off on the south shoulder of the highway, came back on, went out of control, and spun around on the highway, blocking both lanes of traffic. As he saw the Curtis car spinning down the road toward him, Hicks also noted that the Mid-American unit appeared to be approximately 2 feet across the centerline into Churchill's lane. Hicks immediately applied his brakes, they took hold quickly, the unit "jack-knifed and slid down the road kind of at an angle," with the tractor heading southwest and the trailer heading west. Churchill and Mid-American collided, the tractor part of Churchill's rig being approximately in the center of the highway and being struck just in front of its right-hand drive wheels by the front of Mid-American's tractor. Both tractor-trailer units came to rest on the

south side of the highway in the ditch, both tractors generally heading south, with Churchill's trailer extended across, and blocking, the westbound lane of traffic. The Curtis car came to rest on the other side of the highway in the vicinity of the rear end of Churchill's unit. None of the eye-witnesses were aware of any collision between the Curtis automobile with either of the Mid-American or Churchill units.

State Trooper Staton investigated the accident a short time after the occurrence and had conversations with Stuart, Curtis and a Mr. Allen, the driver of another truck. Curtis told him that he had been asleep and was awakened by being thrown around in the car when it was spinning out of control. The trooper testified that Stuart told him that while he was passing the Mid-American rig, he was momentarily blinded by the spray from the wheels of Mid-American, and that when his vision cleared he saw two headlights approaching. "He immediately whipped back in, lost control and came to a rest on the north side of the pavement." On cross examination the trooper stated that he had conversations with Stuart and Curtis in the presence of Mr. Allen, the truck driver that came upon the scene immediately after the collision. He stated further that it was possible that his report as to how the accident occurred resulted from a composite of his investigatory conversations with Stuart, Curtis and Allen, although Allen was not an eye-witness to the accident. (Stuart had testified and denied making the statement to Trooper Staton with the exception of the portion that he was following the semi and was temporarily blinded.)

With respect to speed, Mid-American's tachograph (a scientific instrument which records time and speed while the vehicle is in operation) showed that it was traveling about 45 m.p.h. until 90 seconds before the accident when it reduced speed to just under 20 m.p.h. Stuart said he was passing Mid-American at about 40 m.p.h., although Churchill's driver (Hicks) said Stuart had to be "doing 60 or better to make the pass like he did." Churchill's speed was between 40-50 m.p.h., and Allen, the truck driver who arrived at the scene just after the collision, testified that he had been traveling 40-50 m.p.h. The legal speed limit was 50 m.p.h.

Procedurally, this case was complicated: Kenney (Vanderpool's administrator) and Mid-American sued Churchill for wrongful death, funeral expenses and property damage; Churchill counterclaimed for property damages and also brought in Curtis and Stuart as additional parties defendant to recover property damage; then Kenney sued Stuart, Curtis and Churchill for wrongful death; and finally Mid-American sued Stuart, Curtis and Churchill for property damage. The trial court dismissed

Kenney's wrongful death action against Stuart and Curtis, on the basis that the action was filed too late and, therefore, barred by the Illinois Injuries Act.

Upon trial, the jury found: against Kenney and Mid-American and for Churchill on the complaint (appealed); in favor of Kenney and Mid-American and against Churchill on its counterclaim (no appeal was taken); in favor of Churchill and against Stuart and Curtis in the amount of $29,165.00 (appealed); for Mid-American against Stuart and Curtis and awarded $19,000.00, but against Mid-American and for Churchill (appealed). The jury was also submitted special interrogatories in which it found: Vanderpool (Mid-American's driver) was in the exercise of due care; Hicks (Churchill's driver) was in the exercise of dure care; Stuart and Curtis were guilty of negligence which was the proximate cause of the damages to both Mid-American and Churchill.

In this appeal, to sum it up, Churchill maintains that Stuart's and Curtis's notice of cross appeal was filed too late; Stuart and Curtis argue that it was reversible error for the court to permit the state trooper's testimony as to Stuart's statements; Kenney and Mid-American allege that Churchill (Hicks) was negligent as a matter of law and that the jury's verdict was contrary to the manifest weight of the evidence; and, finally, Kenney further challenges the trial court's dismissal of his wrongful death action against Stuart. We will address ourselves to each issue in this sequence.

■■■ Churchill argues that the notice of cross appeal filed by Stuart and Curtis was too late. Stuart and Curtis did not file a notice of appeal within the prescribed 30 days. Nor did Churchill appeal from its judgment. Yet after that 30 day period had elapsed, but within 10 days after Kenney's appeal, Stuart and Curtis filed a cross appeal challenging Churchill's judgment. Churchill persists in its argument that Stuart and Curtis could not cross appeal Churchill's judgment against them in the absence of Churchill's filing a notice of appeal (which it did not), and that the only persons who had standing to appeal that particular judgment were either Stuart, Curtis or Churchill. Ergo, since Churchill did not appeal, Stuart and Curtis were precluded from cross appealing. We considered the same arguments at the time that we denied Churchill's motion to strike the notice of cross appeal. We adhere to that same position and our interpretation of Illinois Supreme Court Rule 303(a) which provides that "if a timely notice of appeal is filed and served by a party, any other party, within ten days of service upon him, or within thirty days of the entry of judgment, whichever is later, may join in the appeal, appeal separately, or cross appeal by filing a notice of appeal." We believe that the plain meaning of Rule 303(a) is to provide a liberal

and reasonable method for appeal in a multiple party litigation so that if a proper timely notice of appeal is filed to commence the review, then any other party involved in the suit may then participate in the appeal— by either joining or merging, separately appealing, or cross appealing. Furthermore, the committee comments reflect the modern trend to simplify the mechanics of review, placing less emphasis upon form and more upon merits. The obvious intent of the Supreme Court was to make appellate rules less mechanical and to acknowledge the considerable advantages of the review of a case in its entirety and in one proceeding— voiding multiplicity and piece-meal consideration of questions arising from the same circumstances. ( *Robbins v. Campbell,* 65 Ill.App.2d 478, 213 N.E.2d 641, 645-646.) We reaffirm our ruling in this regard.

The investigating state trooper testified on direct that Stuart told him he was following Mid-American, pulled out to pass, was blinded by the spray from the wheels, and that when he cleared the spray he saw two headlights in the oncoming lane of traffic and immediately whipped back in, but then lost control. Stuart, however, denied having made the statement that he saw the two headlights in the oncoming lane of traffic, whipped back and lost control. The state trooper was subjected to a very thorough and scrutinizing cross examination with the obvious intent of counsel to show the jury that this was merely a conclusion of the state trooper that he might have obtained from some remark of either Stuart, or Curtis, or Mr. Allen, or from his own observation of the scene, or from a composite or combination of any, or all, of these sources. The script went this way:

"A. But I talked to John [Stuart] several times—I mean anytime—I'm not gonna say that I talked to him several times, but in the course of my investigation and waiting for ambulances and so on and so forth I may have talked to him two or three or four times. I don't know. I don't remember.

Q. And isn't it true that you may have picked up the idea that the Curtis vehicle saw the Churchill vehicle fast upon him from talking, too, with Mr. Allen?

A. I don't—.

Q. Isn't that just as likely?

A. It could be.

Q. All right  *  *  *

*  *  *

A. I—may I read what I put on my statement?

Q. Certainly. Excuse me.

A. After talking to Mr. Hicks and Mr. Stuart and Mr. Curtis and Mr. Allen, I arrived at this conclusion: That Unit 3 was passing Unit 1,

and when he cleared the spray he saw a set of headlights and whipped back in and went into an uncontrollable spin, which he stated himself, and went out of control.

Q. Now, just a moment, please. What I'm getting at is I have no objection to your drawing a conclusion about what's occurred. I'm only trying to ask you, aren't you very—isn't it true that it's as likely that you picked up the idea that the Curtis vehicle was just at the rear tractor wheels of Mid-American at the time that Churchill was right upon it—you picked that idea up from talking with Mr. ———— either Mr. Curtis, Mr. Stuart, Mr. Allen or simply from your own observation of the general scene? Isn't that a true statement?

*　*　*

A. Yes, sir.

Q. All right, that's my whole point   *   *   *"

In their brief on this issue, Stuart and Curtis set forth a potpourri of argument that such backdoor reference to Stuart's "admission" was without foundation proof, lacked knowledge and was purely speculative. Some oblique references to hearsay were made and a little bit of Wigmore and McCormick were thrown in for good measure. The thrust of the argument, or materiality to the issue, however, escapes us. A reading of the record demonstrates that the state trooper's cross examination was not inconsistent with his direct examination—nor was it contradictory, nor impeaching.

■■■ But assuming, arguendo, that there was even some slight hint of contradiction or inconsistency in his testimony. It seems to us that the state of Illinois law has long been such that the fact that a witness testifies to a different state of facts on cross examination from what he testifies to on direct examination affects merely the weight, and not the competency, of his testimony, and is no ground for excluding it.

"We are not aware of any rule whereby contradictory or inconsistent statements of a witness whether made during the course of a trial or otherwise, thereby render the testimony incompetent   *   *   *. Evidence which tends to impeach the testimony of a witness affects the credibility of the witness and not his competence to testify   *   *   *. Both the complained of testimony and the impeaching statement were presented to the jury and it was the duty of the jury to assess the credibility of the testimony considering both its contradiction and its reasonableness in relation to all other evidence presented." *People v. Mathis*, 82 Ill.App.2d 173, 225 N.E.2d 808, 809.

This was purely a question of weight and credibility, and therefore uniquely within the province of the jury. There was no error at all in the

court permitting the state trooper to testify in this manner, and we so hold.

■■ The jury in this case heard a parade of witnesses, viewed numerous photographs, examined many exhibits and had before it all of the testimony of the three eye-witnesses to the occurrence. Granted, there was conflicting testimony. There were variances and contradictions as to time, distance, conditions and conduct of the participants in this tragedy. But this is not at all singular, as it is a common phenomenon that the human mind possesses imperfect powers of recollection, all subject to countless factors of effect. The testimony before us once again merely demonstrates that man's mind does not portray past events recollected with the scientific and objective precision of a motion picture camera. Kenney and Mid-American argue that Churchill's driver was traveling too fast for conditions (darkness, slippery road, tricky brakes, intensity of the rain, water standing on the road), failed to brake his unit properly, lost control and was, therefore, negligent as a matter of law. We cannot agree. We are not at all persuaded, in the context of all the evidence before us, that this case even approaches the radii of the *Pedrick Rule.*

■■ Nor can we say that this jury's verdcit was contrary to the manifest weight of the evidence. And "manifest" possesses a very uniform and catholic definition: unmistakeable, indisputable, self-evident, undeniable, plain, clear, beyond a doubt. Barring other specific reversible error, such is the test for reversal. (*Schneiderman v. Interstate Transit Lines, Inc.,* 331 Ill.App. 143, 72 N.E.2d 705, 706; *Black v. DeWitt,* 55 Ill.App.2d 220, 204 N.E.2d 820, 822.) "There are many things which a jury observes on the trial in such case that do not appear from the printed record—the appearance of the respective witnesses, their manner of testifying and a great many other circumstances. They are in a much better position in such case to determine the truth of the matter in controversy than a court of review." (*Norkevich v. Atchison, Topeka & Santa Fe Ry. Co.,* 263 Ill.App. 1, 15.) And as we recently stated in *Kotulla v. Great Lakes Terminal & Transport Corp.,* 101 Ill.App.2d 457, 243 N.E.2d 461, 464: "Questions of this nature should never be determined as matters of law where reasonable men would arrive at different results. Under our judicial system, the jury is the fact-finding body to determine such issues." In viewing the evidence as a whole, we find no overwhelming contradictions which give us pause in accepting the jury's general verdicts and special interrogatories, all of which were in perfect accord each with the other, offering no suggestion of contradiction. They are affirmed.

Lastly, Kenney appeals from the trial court's order of dismissal of his

wrongful death action against Stuart as being barred by the time requirements of the Injuries Act (Illinois Revised Statutes, 1963, Chap. 70, Sec. 2), which provides in part that "Every such action shall be commenced within 2 years after the death of such person." Vanderpool, of course, died in the collision on August 25, 1964. Kenney did not seek to file the wrongful death action against Stuart until August 22, 1969, exactly 5 years later. But Kenney now argues in this court (although he apparently did not present this to the trial judge) that the time condition for filing the wrongful death complaint did not apply because Stuart became an officer in the United States Air Force on January 30, 1966, was still in service at time of trial, and therefore the Soldiers' and Sailors' Civil Relief Act applies:

"The period of military service shall not be included in computing any period now or hereafter to be limited by any law, regulation, or order for bringing of any action or proceeding in any court * * * by or against any person in military service * * * whether such cause of action or the right or privilege to institute such action or proceeding shall have accrued prior to or during the period of such service * * *" 50 USCA App. par. 525.

■■■ Stuart contends that it was not until the appeal stage that Kenney even mentioned the Soldiers' and Sailors' Civil Relief Act, that he should not be allowed to wait 5 years before filing a wrongful death action that had to be presented within 2 years under Illinois law, and that therefore he has waived whatever claim that might have existed for the tolling of the time. Certainly, when there is a Federal act which grants exemption to a specific State statutory condition precedent, which in turn is wholly dependent upon a fact of personal status, no trial judge can be reasonably expected to be aware of the applicability unless both the fact and the legislative exemption are brought to his attention. But such failure (the reasons for which are *de hors* this record) to so apprise the trial court does not make the applicability of the federal act any the less pertinent. We are cognizant that trial courts are sometimes right for the wrong reasons—and the fact that the right reasons were not cited or considered does not void the proper action. The converse is likewise true. Yet justice is concerned with results, not reasons for decisions.

Furthermore, says Stuart, the Soldiers' and Sailors' Civil Relief Act was intended, and the courts have so held, to be liberally construed in favor of the serviceman, that what Kenney asks for here cannot possibly represent a benefit to Stuart, and that the act is not properly applied in a circumstance such as this where the serviceman was in fact available, did appear and testified at the times required. We find no merit in Stuart's arguments. The plain reading of the Federal act here recited requires

that Stuart's period of military service be deducted in computing the time between Vanderpool's death and the initial filing of the wrongful death action. The act is not restrictive to merely the serviceman, since it addresses itself to "any action or proceeding in any court   \*   \*   \*    by or against any person in military service." (Underscoring ours.) The Illinois Supreme Court has enunciated its construction of this Federal act and best summarized its interpretation in *Illinois National Bank of Springfield v. Gwinn,* 390 Ill. 345, 61 N.E.2d 249, 254:

> "It is not merely directory or permissive, but is imperatively controlling and automatically extends the period of time allowed for redemption in all cases coming within the application of its terms. It is evident that the provisions [of the Act] are self-executing and that it was not the intention of Congress to make it discretionary with the court whether, *under the facts of a particular case,* an extension of time for redemption should be had." (Emphasis added.)

In *Shell Oil Co. v. Industrial Commission,* 407 Ill. 186, 94 N.E.2d 888, our Supreme Court not only reaffirmed its clear conception of this Act as set forth in the *Gwinn Case,* but furthermore made some apt observations concerning statutes of limitations and time conditions precedent which are here squarely germane. The court said that the Soldiers' and Sailors' Civil Relief Act was "intended to modify not only those statutes properly called statutes of limitations, by which times are fixed for the bringing of actions, but statutes creating a right of action which did not exist independently of the statute where the time for bringing such an action is limited in some way or a condition precedent is imposed by the statute." (Pages 893-894.) Consequently, we hold that the trial court erred in dismissing Kenney's wrongful death action against Stuart. That portion of the trial court's action must be reversed, and it is.

■■■■ And, consistent with such reversal, Kenney contends that the findings below are *res judicata,* since Kenney and Mid-American are in privity, and that this cause should be remanded for the limited purpose of determining damages. Stuart does not challenge that posture in this court, and we agree. The validity of this position is concisely recapped in *Hedlund v. Miner,* 395 Ill. 217, 69 N.E.2d 862, 868:

> "The doctrine of *res judicata* is that a point once adjudicated by a court of competent jurisdiction may be relied upon as conclusive upon the same matter, as between the parties or their privies, in any subsequent suit, in the same or any other court, at law or in chancery. But the doctrine has no application against or in favor of anyone not a party or privy. The doctrine is bottomed on the ground that the party to be affected, or someone with whom he is in privity, has litigated or has had an opportunity to litigate the same matter in a former action in a

994

court of competent jurisdiction." See also, *Sweeting v. Campbell*, 2 Ill.2d 491, 119 N.E.2d 237, 239.

For the above reasons, the lower court's dismissal of Kenney's wrongful death action against Stuart is hereby reversed, judgment in favor of Kenney and against Stuart thereon is granted and this cause is remanded to the trial court for the sole issue of determination of damages. In all other respects, the trial court is affirmed.

Affirmed in part, reversed in part, and remanded with directions.

SMITH, P. J., and CRAVEN, J., concur.