DALE E. RHODES, Plaintiff-Appellant, *v.* JOHN L. OLIVA, Defendant-Appellee—(ROY A. MOFFET, Defendant and Counterclaimant-Appellant.)

(No. 72-303; ▮▮▮▮▮▮▮▮

Third District—August 29, 1973.

John V. Patton, of Moline, and Stuart R. Lefstein, of Rock Island, for appellants.

Dennis R. Fox, of Moline, for appellee.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

This is an appeal from judgments entered in the circuit court of Rock Island County in an action involving an automobile collision as a result of which Dale E. Rhodes and Roy A. Moffet had judgments entered against them and in favor of John L. Oliva. The action resulted from a collision which occurred on November 11, 1971, shortly after 10:00 P.M., as a result of which automobiles operated by Roy A. Moffet and John L. Oliva collided at the intersection of John Deere Road and Colona Avenue in Rock Island County. Dale E. Rhodes, a passenger in the Moffet vehicle, instituted an action in the Circuit Court to recover damage for serious personal injuries which he received and maintained such action against Oliva (Moffet was an original defendant, also). Oliva filed a counterclaim and asserted a damage action against Moffet, and Moffet, in turn, counterclaimed for damages against Oliva. All actions were based upon the contention that the defendant in each asserted claim was guilty of negligence. Following a trial by jury, verdicts were rendered against Moffet in favor of Oliva and assessed the damages of Oliva at $500. Verdicts were also rendered as against Rhodes and Moffet in their actions against Oliva and judgments were rendered on the verdicts. Rhodes and Moffet have appealed to this Court.

In the vicinity of the collision, John Deere Road is a north-south preferred highway with a speed limit of 65 miles per hour. It has two

paved lanes running in each direction, each lane being 12 feet in width, and at its intersection with Colona Avenue there are third, or inner, lanes in each direction for the exclusive use of left-turning vehicles. The intersection is controlled by eight electric traffic lights located on concrete medians and islands at various points in such a fashion that six lights face John Deere and two face Colona. Unless there is traffic approaching the intersection on Colona, the lights continuously show green for John Deere traffic. When traffic does approach on Colona, a signal change is automatically activated. For traffic approaching from the west on Colona, the activator is located 125 feet from the intersection and, once a vehicle passes it, dependent upon the location of traffic approaching on John Deere, 15 or 19 seconds elapse before the lights facing Colona change directly from red to green. During the change sequence, the six lights facing John Deere traffic, change from green to yellow, remain yellow for a period of 4 to 5 seconds, and then change to red at the same time as the two lights controlling Colona change to green.

On the night in question, three automobiles approached the intersection more or less simultaneously. The Moffet car, in which Rhodes was riding, was northbound along the outer northbound lane of John Deere and Moffet was intending to continue on north through the intersection. The car of Oliva was southbound on the inner southbound lane of John Deere, and he was intending to make a left turn onto Colona. The third vehicle, driven by Walter H. Mooney in the company of his wife, approached the intersection from the west on Colona, and it was the intention of the driver to continue east on Colona. As the Mooney auto pulled up to wait for the traffic signal to change to green, defendant started his left turn through the intersection and as he reached the outer northbound lane of John Deere, the collision with the Moffet car occurred. Oliva's car was spun around and remained in the intersection. Moffet's car veered off to the right, struck a light standard, started rolling and burst into flame. Physical evidence indicated that the collision had occurred several feet within the outer northbound lane, and that the left front of Oliva's car had struck Moffet's car in the area of its left front wheel, although Oliva characterized it that the left front of his car had been struck by the side of the Moffet car.

Moffet testified that he could remember nothing about the accident, and that his earliest recall was several days later when he awoke in a hospital. Rhodes, a mechanic by trade, testified that for several hours before the accident he had assisted Moffet with the installation of a used transmission in the latter's car. In order to test the transmission, Rhodes drove the car to a point about one and one-half miles from the intersection and then turned over its operation to Moffet. According to his

further testimony, they approached the intersection in the outer northbound lane at a speed of 55 miles per hour, and that at a distance of about 1500 feet from the intersection he noted that the light for John Deere traffic was green. He stated that Moffet reduced the speed of the car to 45 or 50 miles per hour as they neared the intersection; that 200 feet from the intersection he again noted that the light was green; that he saw Oliva's southbound car approaching the intersection; and that when Moffet's vehicle was about two car lengths from the intersection, at which time the light was still green, he saw Oliva's car start to make a left turn and exclaimed: "Oh my God, he's going to hit us!" Immediately thereafter, Oliva's car struck Moffet's car just behind the left front tire. Rhodes further stated that he did not see a turn signal operating on Oliva's car, and that he didn't notice any other vehicles at the intersection. Relating to the question of speed, both Rhodes and Moffet testified that a newly installed used transmission should not be driven at excessive speeds until about a week after installation, and Moffet stated that to go over 60 miles per hour would ruin the transmission. He conceded on cross-examination, however, that there was nothing to prevent one from driving an automobile equipped with a newly installed used transmission in excess of 60 miles per hour.

Oliva testified that he entered John Deere Road about a mile north of the intersection and proceeded south at a speed of 50 to 55 miles per hour. He said he first noticed that the light was green for John Deere traffic when he was about 200 feet from the intersection, and that he noticed the lights of the northbound Moffet car, which was more distant from the intersection than he was, at the same time. Oliva said that he activated his left turn signal; that he noticed a car to his right on Colona stopping at the intersection; that his speed was slowed to from 10 to 15 miles per hour when he reached the intersection; and that the light was still green. Describing his left turn, Oliva testified that the traffic light turned to yellow as he got about half a car length into the intersection; that at that time the Moffet car was "about no greater than 200 feet from the intersection"; that he continued on with his turn at a speed of 4 to 5 miles per hour; and that he did not again look in the direction of the Moffet vehicle or see it until a split second before impact, which he described as occurring in the east half of the intersection

Mrs. Mooney, appearing as a witness for Oliva, testified in substance that when her husband stopped their car on the west side of the intersection the light for Colona traffic was red; that Oliva's car was into the intersection when she first saw it; that the latter made a left turn

going slowly; and that the light for Colona traffic turned to green while the Oliva car was still within the intersection and headed east. Further, she stated that after the light had changed to green on Colona, she heard and saw the Moffet car approaching the intersection from her right on John Deere, and then saw the Moffet car collide with the rear of Oliva's car. She said that the Moffet car was about one to three car lengths from the intersection when she first saw it, and expressed the opinion that it was traveling at a speed of 70 to 75 miles per hour. On cross-examination, she stated that as they were stopped at the intersection, " we waited more than a minute and the light continued to stay red for us," and persisted in her testimony that she had seen, and knew when, the light on Colona had changed to green. By way of impeachment, however, it was brought out that she had stated on a pre-trial deposition with reference to the green light: "I didn't pay any attention to it, but my husband did."

Consistent with the testimony of his wife, Walter H. Mooney, who suffered from blurred vision in one eye, also testified that the light changed to green for Colona traffic while Oliva was within the intersection making his left hand turn, and that he had heard and seen the Moffet auto approaching from his right after the light had changed. It was his estimate that the speed of the Moffet auto was from 80 to 90 miles per hour. On cross-examination, he stated that the Moffet auto was some 400 to 500 feet from the intersection when he first saw it and, inconsistent with the testimony of all other eyewitnesses, he further stated that the Oliva vehicle had stopped upon reaching the northbound lanes of John Deere and that it had remained stopped for 30 seconds before it was struck by Moffet's car. On direct examination, Mooney testified that he had watched the light controlling his travel turn from red to green, but later admitted on cross-examination that just a few weeks earlier during a discovery deposition he had maintained that such light had turned from red, then to yellow, and only thereafter to green.

The basic contentions raised by Rhodes are that the trial court should have directed a verdict or entered judgment notwithstanding the verdict in his favor and against Oliva on the basis of the evidence which was presented at the trial. He asserts that such evidence established as a matter of law that Rhodes was free from contributory negligence and that Oliva was guilty of negligence which proximately caused the occurrence. In alternative, Rhodes contends that the verdict was adverse to him was contrary to the manifest weight of the evidence and requests that a new trial be granted to him.

■■ While we agree with Rhodes that much of the testimony given

by the Mooneys was confusing and possibly erroneous, a careful examination of the entire record makes clear that there is ample evidence to support the jury's verdicts. The testimony given by Oliva alone clearly allows the inference that Oliva entered the intersection with a green light; that the light immediately thereafter changed to yellow; and that while Oliva was completing his left turn and thus clearing the intersection, the Moffet vehicle came into the intersection in violation of a red light and collided with the Oliva vehicle, at a time when the Oliva vehicle was lawfully there. While Oliva did not have the right to rely upon the assumption that Moffet would obey laws, as an excuse for Oliva's failure to exercise due care (*Tabor v. Tazewell Service Co.*, 18 Ill.App.2d 593, 153 N.E.2d 98), it is likewise true that Oliva was not required to anticipate the negligence on the part of Moffet in running a red light (which the jury apparently believed happened). (*Osborne v. Redell*, 22 Ill.App.2d 193, 159 N.E.2d 841.) The issue as to whether or not Oliva failed to maintain a proper lookout became a question of fact for the jury and was not, as appellants contend, in the category of testimony as to such a concrete fact which would constitute a judicial admission. As the court stated in *Gauchos v. Chicago Transit Authority*, 57 Ill.App.2d 396, 401:

> "What does or does not constitute a judicial admission is a matter of case by case consideration. Before a statement can be held to be a judicial admission it must be given a meaning consistent with the context in which it is found and it must be considered in relation to the other testimony and evidence presented."

See also: *Bartolomucci v. Clarke*, 60 Ill.App.2d 229, 235, where the court emphasized that if reasonable minds draw different inferences or conclusions from the evidence, the trial judge must submit such issues to the jury for determination. As relates to the physical evidence, it is not inconceivable from such evidence, that the left front of the Oliva vehicle, which at the time of impact Oliva stated was moving across the intersection in a southeasterly direction, could have collided with the left side of the Moffet vehicle in the area of the left front wheel of the Moffet automobile.

It is clear that Oliva's testimony could not be classified as inherently incredible and the questions relating to Oliva's negligence or lack thereof were properly within the province of the jury and should not be resolved as a matter of law on the basis of the record. As noted in *Kenney v. Churchill Truck Lines, Inc.*, 6 Ill.App.3d 983, 991, 286 N.E.2d 619, 624:

> "Granted, there was conflicting testimony. There were variances

and contradictions as to time, distance, conditions and conduct of the participants in this tragedy. But this is not at all singular, as it is a common phenomenon that the human mind possesses imperfect powers of recollection, all subject to countless factors of effect. The testimony before us once again merely demonstrates that man's mind does not portray past events recollected with the scientific and objective precision of a motion picture camera."

Emphasis is placed by appellants upon the case of *Pedrick v. Peoria and Eastern R.R. Co.*, 37 Ill.2d 494, 510, 229 N.E.2d 504, 513-514, where the Illinois Supreme Court states:

"* * * verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

Obviously, as we have indicated, this is not the situation in the instant case, in view of the record.

Similarly, we do not find that the verdict in favor of Oliva and against Rhodes is against the manifest weight of the evidence. Employing the standard for overturning a verdict as against the manifest weight of the evidence long in use in Illinois, to conclude that such verdicts were palpably erroneous or that a contrary conclusion is clearly evident would not be justified.

■■ As we have frequently observed, the test is not whether this court, if it were a trier of fact in the case, would have reached a different conclusion than that of the jury. This court is governed solely by an examination of the record and does not have the opportunity to see and hear the witnesses in the case. As stated in *Schneiderman v. Interstate Transit Lines, Inc.*, 331 Ill.App. 143, 147, 72 N.E.2d 705:

"There are many things which a jury observes on the trial * * * that do not appear from the printed record—the appearance of the respective witnesses, their manner of testifying and a great many other circumstances. They are in a much better position * * * to determine the truth of the matter in controversy than a court of review." See also: *Mirich v. T. J. Forschner Contracting Co.*, 312 Ill. 343, 358, 143 N.E. 846; *Kotulla v. Great Lakes Terminal & Transport Corp.*, 101 Ill.App.2d 457, 463, 243 N.E.2d 461, 464.

As we have indicated in many cases, this court is not authorized to substitute its judgment for that of the triers of fact if there is sufficient evidence in the record to support the jury's determination. Since we find

that to be the case in the cause before us, the determination of the jury will not be set aside.

■■ Plaintiff Rhodes has further contended that the jury was improperly instructed on two occasions with respect to whether the Moffet vehicle ran through a red light. From our examination of the transcript of the conference on instructions, it indicates that Rhodes' counsel did not object to such instructions on the ground raised here. The cases in this State have consistently supported a salutary rule that objections not specifically made during the conference on instructions are permanently waived and cannot be interposed subsequently on appeal. (Ill. Rev. Stat. 1971, ch. 110, §67(3); Illinois Supreme Court Rule 239(b); *Onderisin v. Elgin, Joliet & Eastern Ry. Co.*, 20 Ill.App.2d 73, 77-78, 155 N.E.2d 338.) As a consequence, we will not consider the arguments with respect to the contested instructions and express no opinion as to such matters for the reasons stated.

Our observations in this opinion with respect to the evidence as it applies to the action between Oliva and Rhodes is also relevant to the actions between Moffet and Oliva. It is clear from such evidence that it was well within the province of the jury to determine that Oliva was not negligent and that the negligence of Moffet proximately caused the occurrence. Such being the case, the verdict in favor of Oliva and against Moffet cannot be said to be erroneous as a matter of law or contrary to the manifest weight of the evidence.

Since we find no error in judgments of the circuit court of Rock Island County, such judgments are accordingly affirmed.

Judgments affirmed.

DIXON and SCOTT, JJ., concur.